1
2
3
4
5
6                          UNITED STATES DISTRICT COURT

7                         NORTHERN DISTRICT OF CALIFORNIA

8                                SAN JOSE DIVISION

9    MARIA BARROUS, an individual and as        )    Case No.: 10-CV-02944-LHK
     Trustee of the Barrous Living Trust,        )
10   DEMETROIS BARROUS, an individual, dba       )    ORDER GRANTING-IN-PART AND
     Jimmy's Restaurant,                         )    DENYING-IN-PART DEFENDANTS'
11                                               )    MOTIONS FOR SUMMARY
                            Plaintiffs,          )    JUDGMENT
12              v.                               )
                                                 )
13   BP P.L.C., BP EXPLORATION AND OIL,          )
     INC., BP PRODUCTS NORTH AMERICA,            )
14   INC., BP CORPORATION NORTH                  )
     AMERICA, INC., CONOCOPHILLIPS               )
15   COMPANY and DOES 1-20, inclusive,           )
                                                 )
16                          Defendants.          )
                                                 )
17   _____ )

18         Before the Court are Defendants BP p.l.c., BP Exploration and Oil, Inc. ("BP X&O"), BP

19   Products North America, Inc. ("BP Products"), BP Corporation North America, Inc. ("BP North

20   America") (collectively "BP"), and ConocoPhillips Co.'s ("Conoco") Motion for Partial Summary

21   Judgment, ECF No. 65 ("MSJ 1"); Defendants BP p.l.c. and BP North America's Motion for

22   Summary Judgment, ECF No. 70 ("MSJ 2"); Defendant Conoco's Motion for Summary Judgment,

23   ECF No. 78 ("MSJ 3"); and Defendants BP and Conoco's Motion for Partial Summary Judgment

24   as to Punitive Damages, ECF No. 84 ("MSJ 4").  After considering the parties' briefing and oral

25   argument, the Court GRANTS in part and DENIES in part Defendants' motions for summary

26   judgment for the reasons described below.

27
28
                                                 1
     Case No.: 10-CV-02944-LHK
     ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
     JUDGMENT

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## I.  BACKGROUND

This case arises out of the alleged contamination of commercial property in San Jose, California (the "Jimmy's Property") belonging to Plaintiff Maria Barrous and her son, Plaintiff Demetrious Barrous.  Maria Barrous and her husband, John, purchased the Jimmy's Property in 1987.  *See* ECF No. 92 (Barrous Decl.) ¶ 2-3.  Soon afterward, Plaintiffs assumed responsibility for the restaurant operated on the property, which they called "Jimmy's Restaurant" (the "Restaurant").  *Id.* ¶ 3.  John Barrous died in 2005, and ownership of the Jimmy's Property and the Restaurant was transferred to a living trust controlled by Maria Barrous for the benefit of Demetrious Barrous.  *See id.* at ¶ 1-3.  Currently, Demetrious Barrous manages the Restaurant, and his mother works there full-time.  *See id.*

Since 1973, a gas station (the "Station") (collectively with the Jimmy's Property and the Restaurant, the "Site") has been operated on a parcel of land neighboring the Jimmy's Property.  In 1989, a predecessor to BP Products[1] bought the Station from its previous owner, Mobil.  *See* ECF No. 72 (Skance Decl.) ¶ 3.  In 1994, BP Products sold the Station to Tosco Corporation, the predecessor to Conoco.  *See id.* at ¶ 4.  Conoco operated the Station until 2009, when it sold the property to a third party.  *See* ECF No. 97, Ex. B (Mosconi Depo.) at 92.

### 1.  Contamination at the Site and the "Access Agreement"

In 1992, soil testing revealed that the property on which the Station was located had been contaminated by leakage from underground gasoline tanks.  *See* ECF No. 93 (Helm Decl.) Ex. A at 19.[2]  When the Station was sold to Conoco in 1994, additional testing indicated further

---

[1]    The Station was purchased by Sohio Oil Company, which changed its name to BP X&O in 1989.  *See* ECF No. 72 (Skance Decl.) ¶ 3.  BP X&O became BP Products by merger in 2001.  *Id.* To avoid confusion, the Court will refer to both BP X&O and BP Products as "BP Products."

[2]    Plaintiffs' statement of facts relies primarily on the expert report of Ron Helm, a certified engineering geologist who conducted a study of the affected site.  Defendants argue that Mr. Helm's report is inadmissible because it is "unsworn and unverified."  MSJ 1 Reply at 2 n.1.  However, the Helm Declaration is sworn under penalty of perjury.  *See* ECF No. 93 (Helm Decl.) ¶ 10.

Much of the information contained in Mr. Helm's report, upon which the declaration is based, is hearsay.  An expert may properly rely on information that is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. Fed. R. Evid. 703.  The facts or data upon which an expert bases an opinion or inference need not be

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1    contamination.  *See id.*  In 1998, new testing again revealed subsurface contamination of soil and,

2    for the first time, groundwater.  *See id.* at 20.  The following year, the Santa Clara Valley Water

3    District ("SCVWD") required BP Products to investigate the soil and groundwater impact of the

4    leak at the Station.  *Id.*  As part of its investigation, BP Products took soil samples from the

5    Jimmy's Property.  *Id.*  In late 1999, BP Products informed Plaintiffs that the Jimmy's Property

6    "might be contaminated."  ECF No. 92 (Barrous Decl.) ¶ 5.

7        In 2000, BP Products entered into an agreement with Plaintiffs allowing BP Products to

8    access the Jimmy's Property in order to monitor contamination (the "Access Agreement").  *See*

9    ECF No. 34, Ex. B (Access Agreement).  The Access Agreement also contains a provision entitled

10   "Value Protection Agreement," which requires BP Products to indemnify any lender, lessee or

11   purchaser of the Jimmy's Property from liability resulting from contamination caused by BP

12   Products.  *See id* ¶ 18.  In addition, the agreement prohibits assignment of BP Products' rights and

13   obligations under the contract without Plaintiffs' prior written consent.  *Id.* ¶ 26.  Finally, the

14   agreement provides that any dispute between the parties will be referred to mediation.  *Id.* ¶ 25.

15       **2.  Subsequent Remediation Efforts**

16       In 2001, the SCVWD issued a Clean Up and Abatement Order requiring BP to complete

17   interim remedial actions to reduce contamination caused by the leak at the Station.  *See* ECF No.

18   93 (Helm Decl.), Ex. A at 20.  In September 2002, BP submitted a Corrective Action Plan ("CAP")

19   explaining the results of its investigation and proposing possible remedial alternatives.  *See* ECF

20   No. 67 (Lee Decl.), Ex. A at A-11-14.  The following month, the Santa Clara County District

21   ─────────────────────────────────────

22   admissible in evidence.  *Id.*  In addition, "an expert is permitted to disclose hearsay for the limited purpose of explaining the basis for his expert opinion."  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984).

23       Here, Mr. Helm declared that in his opinion, "both BP and ConocoPhillips improperly

24   delayed implementing appropriate source control and remediation efforts to control the contamination…This delay fell below generally accepted professional engineering standards."
     ECF No. 93 (Helm Decl.) ¶ 5.  Mr. Helm's report cataloging the history of contamination at the

25   Site "explain[s] the basis for his expert opinion."  *Paddack*, 745 F.2d at 1262.  Mr. Helm also

26   stated that his report was based on "a substantial amount of documentation regarding the history of the site including information available through the state Geotracker database."  ECF No. 93 (Helm

27   Decl.) ¶ 3.  As Defendants do not argue that such information is not of a type "reasonably relied upon by experts in the particular field" nor make a more specific objection, the Court declines to

28   find Mr. Helm's declaration or his report inadmissible.

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

1    Attorney's Office charged BP with violations of California Health and Safety Code sections

2    25299.01 and 25299.02 for failing to monitor, test and report on the Station's underground storage

3    tanks.  *See id.*, Ex. B at 39.  Simultaneously, BP Products, the SCVWD and the District Attorney's

4    office entered into a stipulated judgment under which BP Products was required to immediately

5    implement the CAP.  *See id* at 43.

6        From 2002 to 2009, remediation activities were conducted on the Site pursuant to the CAP

7    and the consent decree.  The SCVWD monitored the cleanup effort until 2004, when oversight was

8    transferred to the Santa Clara County Department of Environmental Health ("DEH").  *Id.* at ¶ 2.

9    Conoco partially assumed cleanup obligations from BP Products in 2005, agreeing to pay 60% of

10   remediation costs.  *See* ECF No. 97, Ex. B (Mosconi Depo.) at 42.  In addition, Conoco took over

11   as the "lead party" in charge of managing remediation activities and communicating with the

12   regulatory agency.  *Id* at 91.

13       In 2006, Conoco attempted to enter into a License Agreement with Plaintiffs granting

14   Conoco access to the Jimmy's Property, but the parties failed to reach an agreement.  *See* ECF No.

15   92 (Barrous Decl.) ¶ 10, 11; ECF No. 80, Ex. E (Lathrop Decl.) at 1.  Nevertheless, environmental

16   consultants working "jointly" under BP and Conoco continued to access the Jimmy's Property to

17   conduct remediation activities.  ECF No. 97, Ex. B (Mosconi Depo.) at 64.  Conoco never executed

18   a separate access agreement with Plaintiffs.  *Id.*

19       The same year, the DEH approved an amended CAP.  *Id.* at ¶ 4.  In 2009, BP Products paid

20   Conoco to take over its remaining remediation responsibilities under the amended CAP.  *See* ECF

21   No. 99 (Ellenberg Decl.), Ex. I.  Shortly thereafter, Conoco sold the Station to a third party and

22   engaged a new environmental consultant, Delta, to assume all cleanup obligations.  *See* ECF No.

23   97, Ex. B (Mosconi Depo.) at 92.  Delta petitioned the DEH to declare the mandated remediation

24   complete.  *See* ECF No. 97, Ex. D (Deposition of Douglas Umland) at 23; 30.[3]  The DEH

25   concurred, and in late 2009, Delta transitioned its efforts from remediation to monitoring.  *See* ECF

26   No. 67 (Lee Decl.) ¶ 6.

27

28

---

[3] Delta's 30(b)(6) witness testified that the criteria upon which regulatory approval is granted are subject to negotiation.  *See* ECF No. 97, Ex. D (Deposition of Douglas Umland) at 23; 30.

4

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

United States District Court
For the Northern District of California

1    On May 27, 2011, the DEH issued a letter announcing the agency's preliminary

2    determination that the Site had been adequately remediated, and inviting public comment. *See id.*,

3    Ex. G. No comments were received, and on August 5, 2011, the DEH sent a letter to Defendants

4    explaining that no further action was required while the DEH reviewed the case for closure. *See*

5    ECF No. 103-3, Ex. A (Lee Supl. Decl.).

6    **3. Plaintiffs' Attempts to Develop the Jimmy's Property**

7    Plaintiffs unsuccessfully sought financing to redevelop the Jimmy's Property in 2000, 2005

8    and 2006. *See* ECF No. 92 (Barrous Decl.) ¶ 8; 14. According to Plaintiffs' expert, the

9    contamination "significantly impacted Plaintiffs' ability to obtain financing" on their property. *See*

10   ECF No. 95 (Corsello Decl.) at ¶ 4.

11   **4. The Instant Litigation**

12   In May 2009, Plaintiffs, contemplating litigation, invited BP Products to engage in

13   mediation as provided by the Access Agreement. *See* ECF No. 97 (Ellenberg Decl.), Ex. P. BP

14   Products forwarded Plaintiffs' request to Conoco. *Id.*, Ex. Q. Plaintiffs met with Conoco to

15   discuss settlement; BP Products did not participate. *Id.*, Ex. R.

16   Unable to reach an accord, Plaintiffs filed a complaint against BP and Conoco on May 20,

17   2010, alleging nuisance, trespass, and negligence claims stemming from the contamination of the

18   Jimmy's Property and the Restaurant, contract claims for Defendants' breach of and interference

19   with the Access Agreement, and seeking declaratory judgment. *See* ECF No. 1 (Notice of

20   Removal). The complaint was subsequently removed from state court. *See id.* This Court found

21   that the Access Agreement does not require BP to perform any remediation, significantly reducing

22   the scope of Plaintiffs' contract claims. *See* ECF No. 29 at 5-9 (Order Granting in Part and

23   Denying in Part Motions to Dismiss). After conducting substantial discovery, Defendants filed

24   four separate motions for Summary Judgment.

25

26   **II. LEGAL STANDARD**

27

28

5

**United States District Court**
For the Northern District of California

1    Summary judgment is appropriate if there is no genuine issue of material fact and the

2    movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*,

3    477 U.S. 317, 321 (1986).  Material facts are those which may affect the outcome of the case.  A

4    dispute as to a material fact is "genuine" only if there is sufficient evidence for a reasonable trier of

5    fact to decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

6    (1986).  On a motion for summary judgment, the Court draws all reasonable inferences in the light

7    most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

8    475 U.S. 574, 587 (1986).  "[T]he district court does not assess credibility or weigh the evidence,

9    but simply determines whether there is a genuine factual issue for trial."  *House v. Bell*, 547 U.S.

10   518, 559-60 (2006).

11    The moving party has the initial burden of production for showing the absence of any

12   material fact.  *Celotex*, 477 U.S. at 331.  The moving party can satisfy this burden in two ways.

13   "First the moving party may submit affirmative evidence that negates an essential element of the

14   nonmoving party's claim.  Second, the moving party may demonstrate to the Court that the

15   nonmoving party's evidence is insufficient to establish an essential element of the nonmoving

16   party's claim."  *Id*.  Once the moving party has satisfied its initial burden of production, the burden

17   of proof shifts to the nonmovant to show that that there is a genuine issue of material fact.  *Id.*  A

18   party asserting that a fact is genuinely disputed must support that assertion by either citing to

19   particular parts of the record or by showing that the materials cited by the moving party do not

20   establish the absence of a genuine dispute.  Fed. R. Civ. P. 56(c).  The nonmovant must go beyond

21   its pleadings "and by her own affidavits, or by the depositions, answers to interrogatories, and

22   admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*,

23   477 U.S. at 324 (internal quotation marks and citation omitted).

24

25                                    **III. DISCUSSION**

26    A.    **The Identity of the Parties Before the Court**

27

28

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

**United States District Court**
For the Northern District of California

1    As a threshold matter, Defendants object to the presence of several parties currently before

2  the Court.  First, BP argues that liability of two named Defendants, BP p.l.c. and BP North

3  America, is foreclosed because the conduct at issue involves only BP Products, a subsidiary

4  corporation.  Second, Defendants contend that Plaintiff Demetrious Barrous lacks standing to sue.

5    **1. Liability of BP's Parent Companies**

6    Plaintiffs' complaint names four of BP's corporate entities:  (1) BP X&O, the original

7  owner and operator of the Station; (2) BP Products, the successor to BP X&O, created following a

8  merger with Amoco;[4] (3) BP North America, the U.S. parent company of BP Products; and (4) BP

9  p.l.c., the London-based parent of the entire BP family of companies.  BP argues that because BP

10  North America and BP p.l.c. did not own or operate the Station, those entities cannot be held liable

11  in tort for any alleged contamination.  In addition, BP contends that because the parent companies

12  were not parties to the Access Agreement, they could not have breached any contractual provisions

13  contained therein.  Plaintiffs, however, do not assert that BP North America and BP p.l.c. are

14  directly liable in tort or contract.  Instead, they argue that the parent companies are liable for the

15  tortious acts and bound by the contractual obligations of BP Products under an agency theory.

16    **a. Existence of an Agency Relationship**

17    It is the general rule that a parent corporation and its subsidiary are separate legal entities.

18  *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1192 (N.D. Cal. 2009).

19  However, a parent may be held liable for the acts of its subsidiary when the subsidiary is

20  established to be the agent of the parent.  *Id.*  "Whether an agency relationship exists between a

21  parent corporation and its subsidiary is normally a question of fact."  *Bowoto v. ChevronTexaco*

22  *Corp.*, 312 F. Supp. 2d 1229, 1241 (N.D. Cal. 2004) (internal citations omitted).

23    A party seeking to establish an agency relationship must show that the parent "so controls

24  the subsidiary as to cause the subsidiary to become merely the instrumentality of the parent."

25  *Pantoja*, 640 F. Supp. 2d at 1192.  "As a practical matter, the parent must be shown to have moved

26

27  ───────────────
   [4]    Defendants do not argue that BP X&O and BP Products have differing liability under
   Plaintiffs' claims.  As noted earlier, the Court will refer to both entities jointly as "BP Products"
28  although the parties sometimes refer to them separately or as "BP X&O/BP Products."

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

United States District Court
For the Northern District of California

1   beyond the establishment of general policy and direction for the subsidiary and in effect taken over

2   performance of the subsidiary's *day-to-day* operations in carrying out that policy."  *Sonora*

3   *Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 542 (Cal. Ct. App. 2000) (emphasis in

4   original).  Alternatively, some courts have suggested that an agency relationship can be found

5   where the subsidiary performs services that are "sufficiently important to the [parent] corporation

6   that if it did not have a representative to perform them, the corporation's own officials would

7   undertake to perform substantially similar services."  *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th

8   Cir. 2001) (discussing agency in the context of asserting personal jurisdiction over a foreign

9   corporation); *see also Bowoto*, 312 F. Supp. 2d at 1241 (noting the existence of the "control" test

10  and the "services" test).

11          The agency inquiry should focus on the relationship between the parent and subsidiary

12  corporation surrounding the conduct that gives rise to the plaintiff's claim, "rather than the more

13  global question of whether any sort of agency relationship exist[s]."  *Id.*[5]  Without more, a

14  "financial link" between a parent and its subsidiary is not sufficient to prove an agency

15  relationship.  *Pantoja*, 640 F.Supp.2d at 1192 (no agency relationship where the plaintiff's

16  allegations indicate only that the parent purchased the subsidiary company).

17          Plaintiffs make a number of arguments to support their contention that BP Products is an

18  agent of BP's parent companies.  First, Plaintiffs contend that BP's employees, including the

19  individual who led BP Products' remediation efforts at the Site, do not distinguish between the

20  various BP corporate entities.  *See* Opp. to MSJ 2 at 12 (citing ECF No. 97, Ex. A (Skance Depo.)).

21  Second, Plaintiffs point out that BP itself does not differentiate its corporate entities in its external

22  communications, including its corporate website.  *Id.*  Third, Plaintiffs argue that BP p.l.c. and BP

23

24  _____
    [5]       While the analysis is necessarily case specific, the *Bowoto* court found the following factors
    instructive: (1) the degree and content of communications between subsidiary and parent,
25  particularly including the communications surrounding the conduct at issue in the case; (2) the
    degree to which the parent set or participated in setting policy, particularly policy relevant to the
26  plaintiff's claim; (3) the officers and directors which parent and subsidiary had in common; (4) the
    reliance on the subsidiary for revenue production and acknowledgment of the importance of the
27  subsidiary to the overall success of the parent's operations; and (5) the extent to which the
    subsidiary, if acting as defendants' agent, was acting within the scope of its authority during the
28  events at issue.  312 F. Supp. 2d at 1243.

                                                         8

1    Oil Marketing Co., another BP affiliate, received "substantial consideration" for the sale of the

2    Station by BP Products to Conoco in 1994.  *See* Opp. to MSJ 2 at 12; ECF No. 97-2 (Eldredge

3    Decl.), Ex. H at 4.[6]  Finally, Plaintiffs assert that BP North America was responsible for the

4    allegedly deficient remediation of the contaminated site.  *See* Plaintiffs' Opp. to MSJ 2 at 13.  To

5    support this contention, Plaintiffs rely on the testimony of John Skance, an employee of "Atlantic

6    Richfield, Inc.," the company in charge of BP Products' "remediation management function,"

7    including the cleanup of the Jimmy's Property.  ECF No. 97, Ex. A (Skance Depo.) at 11.

8    Although the legal relationship between Atlantic Richfield, Inc. and BP is far from clear, Mr.

9    Skance testified that he worked simply for "BP," and that as of January 2010, his paychecks came

10   from "BP Corporation North America."  *Id*. at 9-10.[7]

11                **i. Agency Relationship Between BP Products and BP North America**

12          While it is a close question, the Court finds there is a genuine issue of material fact as to the

13   existence of an agency relationship between BP North America and BP Products.  A reasonable

14   jury could infer from Mr. Skance's testimony that although BP Products is the "responsible party

15   of record" charged with overseeing the cleanup, BP North America exerts some control over day-

16   to-day operations at the contaminated site.  BP North America pays the salaries of the employees in

17   its remediation management division, who apparently believe they work for "BP," rather than an

18   independent entity.  While Mr. Skance testified that the name on his paychecks did not change to

19   "BP North America" until 2010, BP has emphasized that the legal relationship between BP North

20   America and Atlantic Richfield has never changed.  *See* MSJ 2 Reply at n.12.  A reasonable juror

21   could therefore conclude that BP North America held the purse strings at Atlantic Richfield before

22   _____

23   [6]      In fact, while both entities are named in the contract of sale, the contract states  that BP
     p.l.c.'s contribution was intended "in consideration for the execution of the Noncompetition
24   Agreement," rather than for sale of the Station itself.  *See* ECF No. 97-2 (Eldredge Decl.), Ex. H at
     4

25   [7]      Defendants later submitted a declaration from Mr. Skance stating that "my understanding is
26   that Atlantic Richfield Company and BP Corporation North America, Inc. are separate entities and
     that neither has merged with each other."  ECF No. 106 (Supplemental Declaration of John C.
27   Skance).  Plaintiffs have objected to the submission of Mr. Skance's declaration as untimely.  As
     the Court does not rely on Mr. Skance's declaration, the Court need not reach the issue of
     Plaintiff's objection.
28
                                                        9
     Case No.: 10-CV-02944-LHK
     ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
     JUDGMENT

2010, and that the change to the name on employee paychecks was semantic.  In addition, because Plaintiffs' claim is that the remediation campaign conducted by BP Products through Atlantic Richfield was insufficient, the close relationship between those entities and BP North America is more than simply a "financial link."  *Pantoja*, 640 F.Supp.2d at 1192.  Rather, the "arrangement [is] relevant to the plaintiff's claim of wrongdoing."  *Bowoto*, 312 F. Supp. 2d at 1241.

### ii. Agency Relationship Between BP Products and BP p.l.c.

On the other hand, there is no issue of material fact regarding BP p.l.c.'s liability.  The only direct link between BP p.l.c. and the conduct at issue is the fact that the British parent received payment as part of the sale of the Station to Conoco.  However, as noted above, the consideration granted during that transaction was for the execution of a Noncompetition Agreement, not the sale of property.  BP p.l.c.'s prospective agreement not to compete with Conoco does not indicate that it exerted control over the sale.  At most, it suggests involvement with a single negotiation, rather than influence over the subsidiary's day-to-day operations.  More importantly, unlike the remediation efforts, the sale of the Station to Conoco did not give rise to the alleged harms, and is thus less "relevant to the plaintiff's claim of wrongdoing."  *Id.*

Therefore, the Court GRANTS Defendants' motion for summary judgment as to BP p.l.c. but DENIES the motion as to BP North America.

### 2. Demetrious Barrous' Standing to Sue

#### a. Tort Claims

Defendants argue that Demetrious Barrous lacks standing to sue for damage to the Jimmy's Property under a tort theory because he has "no ownership, possessory or any other interest" in the property.  MSJ 1 at 17.  The proper plaintiff in an action for trespass to real property is the person in actual possession.  *Smith v. Cap Concrete, Inc.*, 133 Cal. App. 3d 769, 774 (Cal. Ct. App. 1982) "Any interest sufficient to be dignified as a property right" will support an action based on a private nuisance, including a tenancy for a term.  *Venuto v. Owens-Corning Fiberglas Corp.*, 22 Cal. App. 3d 116, 125 (Cal. Ct. App. 1971).  However, "such right does not inure in favor of a licensee, lodger or employee."  *Id.*

United States District Court
For the Northern District of California

Here, Plaintiffs have alleged that Demetrious Barrous is the manager of the Restaurant and beneficiary of the living trust that owns the Jimmy's Property.  *See* ECF No. 92 (Barrous Decl.) ¶ 2-3.  Mr. Barrous cannot assert standing to sue as the manager of the Restaurant.  While he may spend every waking hour on the property, the record shows his status to be that of an employee, not a tenant or owner.  Nor does Mr. Barrous have standing as a trust beneficiary.  *See Saks v. Damon Raike & Co.*, 7 Cal. App. 4th 419, 427 (Cal. Ct. App. 1992) ("The beneficiary of a trust generally is not the real party in interest and may not sue in the name of the trust. A trust beneficiary has no legal title or ownership interest in the trust assets; his or her right to sue is ordinarily limited to the enforcement of the trust, according to its terms.").[8]  The Court therefore GRANTS Defendants' motion to bar Mr. Barrous from pursuing tort claims against Defendants.

### b. Contract Claims

Mr. Barrous was a signatory to the Access Agreement, along with his mother and father. *See, e.g.*, ECF No. 66, Ex. A (Barrous Depo.) at 96.  Defendants argue that he signed on behalf of his employer, Jimmy's Restaurant, and that he therefore lacks standing to sue.  *See, e.g.*, *Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*, 2011 WL 718662, *2 (S.D. Cal. Feb. 22, 2011) (noting that where an agent signs a contract on behalf of a principal, only the principal can enforce the contract).

Although Mr. Barrous is named in the First Amended Complaint ("FAC") as "Demetrious Barrous, an individual, dba Jimmy's Restaurant," when asked why he was made a party to the Access Agreement, Mr. Barrous testified: "I guess they wanted me to sign it.  I don't know."  ECF

---

[8]     If Maria Barrous, as trustee and property owner, were not pursuing this claim, Demetrious Barrous might have standing to proceed.  *See Saks*, 7 Cal. App. 4th at 427 ("Where a trustee cannot or will not enforce a valid cause of action that the trustee ought to bring against a third person, a trust beneficiary may seek judicial compulsion against the trustee.  In order to prevent loss of or prejudice to a claim, the beneficiary may bring an action in equity joining the third person and the trustee.").

11

No. 66, Ex. A (Barrous Depo.) at 96:18-19.  Whether Mr. Barrous signed the contract on behalf of

his employer or as an individual is thus a question of fact.

Defendants also protest Mr. Barrous' contract claims on the basis that he suffered no

damages as a result of the alleged breaches.  The Access Agreement provides that "BP is solely

responsible for...any damage...to property caused by the entry of BP or its employees."  ECF No.

34, Ex. B (Access Agreement) ¶ 8.  Mr. Barrous claims to have paid $4,000 out of his own pocket

to repair curbs and sprinklers allegedly damaged by Defendants during remediation, and Plaintiffs'

assert that he now seeks compensation through their request for "restoration costs."  *See* ECF No.

92 (Barrous Decl.) ¶ 18.  As Defendants do not argue that they already assumed responsibility for

those costs, there is an issue of fact as to whether Mr. Barrous' damages resulted from Defendants'

alleged breach.  Accordingly, the Court DENIES Defendants' motion to preclude Mr. Barrous from

pursuing claims for breach of contract.

### B.     Tort Damages and Timeliness of Tort Claims

### 1. Whether Plaintiff May Seek "Prospective Damages" in Tort

Defendants do not dispute the substantive elements of Plaintiffs' tort claims.  Instead,

Defendants take issue with Plaintiffs' claims for "prospective damages," contending that

"diminution in value and lost opportunity damages are unrecoverable" under a nuisance, trespass or

negligence theory.  MSJ 1 at 7.

To obtain prospective damages for nuisance or trespass, Plaintiffs must prove that the

contamination of their property is permanent, rather than continuing.  *FDIC v. Jackson-Shaw*

*Partners No. 46, Ltd.*, 850 F. Supp. 839, 842, 844 (N.D. Cal. 1994); *Holdgrafer v. Unocal Corp.*,

160 Cal. App. 4th 907, 926 (Cal. Ct. App. 2008).  The crucial distinction between a permanent and

continuing harm is whether the harm is abatable.  *Mangini v. Aerojet-General Corp.*, 230 Cal. App.

3d 1125, 1148 (Cal. Ct. App. 1991).  Whether contamination by toxic waste is a permanent or

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

abatable injury is ordinarily a question of fact turning on the nature and extent of the

contamination. *Id.* at 1148. Where a party cannot produce "substantial evidence" that the harm is

capable of being abated at a reasonable cost, the nuisance must be deemed permanent. *Mangini v.*

*Aerojet-General Corp.*, 12 Cal. 4th 1087, 1090 (Cal. 1996). However, if the evidence reasonably

supports a finding of either permanent harm or abatable harm, a plaintiff may elect which type of

harm to pursue. *Beck Dev. Co. v. S. Pac. Trans. Co.*, 44 Cal. App. 4th 1160, 1217 (Cal. Ct. App.

1996).[9]

　　　BP argues that "the DEH's determination that the property has been adequately assessed

and remediated precludes Plaintiffs' efforts to treat this case as 'permanent.'" MSJ 1 Reply at 3.

BP relies on two documents: (1) DEH's letter of May 27, 2011 noting that the agency is preparing

to close its investigation of the properties neighboring the Station because it has concluded that

---

[9]　　　In their Rule 26 disclosures, Plaintiffs seek the following recovery:

　　　(1) Lost opportunity damages for being unable to develop Plaintiffs' property to
　　　maximize the property's income earning potential because of the conduct alleged
　　　in the First Amended Complaint…;
　　　(2) Decreased value of the property because of the contamination…;
　　　(3) Restoration Costs for property to pre-contaminated state…;
　　　(4) Discomfort and Annoyance Damages…

Plaintiffs argue that these damages are not "prospective." Instead, Plaintiffs assert that
their claims refer to "current diminution in value and past diminution in value," as well
as "net cash flow lost by the plaintiffs as a result of their inability to obtain…financing"
instead of "future lost sales." Opp. To MSJ 1 at 22.

　　　Plaintiffs' claims are premised essentially on the assumption that but for
Defendants' unlawful conduct, Plaintiffs would have been able to profitably redevelop
the Jimmy's Property. At least one California court has suggested that damages related
to the inability to finance or redevelop land should be considered "diminution of value"
claims, and therefore precluded under a continuing harm theory. *See Gehr v. Baker*
*Hughes Oil Field Operations, Inc.*, 165 Cal. App. 4th 660 (Cal. App. 2d Dist. 2008)
(Plaintiff could not seek "interest rate differential damages" resulting from a bank's
unwillingness to refinance property contaminated by the Defendant because the harm to
their property was continuing). As Plaintiffs do not cite contrary authority, the Court
will characterize both their "lost opportunity" and "decreased value" claims to be
"diminution in value" claims requiring a finding that the harm is permanent.

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

"the residual soil and groundwater contamination at the site does not pose a continuing, significant threat to groundwater resources, human health or the environment," ECF No. 67 (Lee Decl.), Ex. G; and (2) DEH's letter of August 5, 2011 stating that "no further action is required at your site while we review your file for possible case closure." ECF No. 103-3, Ex. A (Lee Supl. Decl.). According to BP, the DEH's communications indicate that the harm to Plaintiffs' property is not only "abatable…[it] has now been abated." MSJ 1 at 9. Defendants thus urge the Court to hold that Plaintiffs cannot recover for any diminution of the value of their property.

Plaintiffs counter with an expert report opining that the contamination of the Jimmy's Property will likely persist for decades and that genuine remediation would be "cost prohibitive." *See* ECF No. 93 (Helm Decl.) at ¶ 8. Plaintiffs' expert further states that in his experience, it is not uncommon for the DEH to reopen a site after a No Further Action letter has been issued. *Id*. at ¶ 9. In addition, Plaintiffs note that Defendants' expert admits that despite the DEH's letter, "some residual contamination exists above the cleanup levels proposed in the CAP." *See* ECF No. 67 (Lee Decl.) at ¶ 10.

Defendants cite no authority for the proposition that an agency "no further action" letter requires a finding that a harm is abatable as a matter of law. In *Capogeannis v. Superior Ct.*, 12 Cal. App. 4th 668 (Cal. Ct. App. 1993), relied upon by Defendants, the plaintiffs' property was contaminated by leakage from underground fuel storage tanks owned by the defendants. Because the applicable statute of limitations had expired, the plaintiffs sought to characterize the harm as continuing rather than permanent. In response, the defendants submitted expert testimony opining that "[a]lthough the soil and groundwater contamination might be remediated to a level acceptable to the Santa Clara Valley Water District and the Central Coast Regional Water Quality Control Board, the contamination is not entirely abatable because there will always be some residual contamination regardless of the technology or combination of technologies used." *Id.* at 680.

14

1   Based on the expert's report, the defendants argued that the contamination could not be abated and

2   should be considered a permanent harm. *Id*.  The Court of Appeal disagreed, reasoning in part that

3   if the contamination could be reduced to meet government standards, "at the very least the question

4   whether this was a permanent or a continuing nuisance was so close or doubtful as to empower the

5   [plaintiffs] to proceed on a theory of continuing nuisance." *Id*. at 681.  The court explained in

6   dicta, "we are satisfied to presume that cleanup standards set by responsible public agencies

7   sufficiently reflect expert appraisal of the best that can be done to abate contamination in particular

8   cases.  As judges we will not presume to insist upon absolutes these agencies do not require." *Id*.

9   at 683.

10          *Capogeannis* does not require the Court to take Defendants' position.  Although the Court

11  of Appeal held that pollution capable of meeting regulatory standards *could* be considered abated,

12  it did not find that it *must* be so characterized.  *See also Holdgrafer v. Unocal Corp*., 160 Cal. App.

13  4th 907, 926-27 (Cal. Ct. App. 2008) ("Cleaning up contamination to a level acceptable to or

14  ordered by a governmental agency *may* suffice to establish that a trespass or nuisance is abatable

15  and therefore continuing.") (emphasis added); *Mangini v. Aerojet-General Corp.*, 12 Cal. 4th 1087,

16  1102 (Cal. 1996) (while regulatory standards could provide evidence of abatability, because the

17  EPA had not yet determined site-appropriate cleanup levels, "plaintiffs cannot rely on any

18  regulatory agency as setting the standard for abatement in this case.").  In fact, while *Capogeannis*'

19  dicta puts a good deal of faith in government standards, its holding is that where the parties argue

20  contamination can be reduced to such levels, the plaintiff may elect under which theory to proceed.

21  *See also id*. (noting that *Capogeannis* presented a factual question).

22          A factual scenario much closer to the case at hand is presented by *Shamsian v. Atl. Richfield*

23  *Co.*, 107 Cal. App. 4th 967 (Cal. Ct. App. 2003).  In *Shamsian*, gasoline leakage from an

24  underground storage tank formerly operated by the defendant caused soil and groundwater

15

contamination. *Id.* at 973. The defendant initiated a remediation program with agency oversight and hired an environmental consultant who eventually submitted a report to the governing agency requesting approval to cease remediation. *Id.* Based on that report, the agency issued a "no action letter." *Id.* Shortly thereafter, the plaintiffs purchased a nearby property and hired an environmental consultant who determined that the soil was still contaminated above regulatory levels, and in greater levels than those reported by the defendant's consultant. *Id.* The plaintiff sued, and the trial court found that because the agency had closed the investigation, the harm was abatable. *Id.* at 974. While plaintiff's appeal was pending, the agency issued a "case reopen letter" stating its concern that the contamination had not been adequately addressed. *Id.* at 975. Considering the record, the Court of Appeal found that the case presented a factual question:

> Although the [Defendants'] site disclosure request and the [agency's] "no further action" letter create a reasonably deducible inference that the contamination at the site was remediated, the report prepared by [plaintiffs' consultant], and the [agency's] subsequent case reopen letter create an equally reasonably deducible inference that the contamination at the site still exceeds regulatory limits and was not properly remediated. As we previously indicated, we must resolve all doubt regarding the propriety of granting summary judgment in favor of the party opposing it. The evidence submitted below and the case reopen letter create doubt as to the propriety of granting summary judgment.

*Id.* at 982.

Defendants argue that unlike in *Shamsian*, Plaintiffs here "have presented no evidence that the environmental condition of their property is any different from what DEH relied upon when it issued its letter requiring 'no further action.'" MSJ 1 Reply at 5. The Court agrees that the evidence offered by Plaintiffs to show the insufficiency of BP's remediation effort is weaker than the evidence before the court in *Shamsian*. However, *Shamsian* requires only that Plaintiffs' evidence creates a "reasonably deductible inference" that the contamination at the Site was not properly remediated. *Shamsian*, 107 Cal. App. 4th at 982. Plaintiffs' expert report and the fact that

16

contamination levels remain above those initially proposed by the Defendants and

approved by the SCVWD create such an inference.  Therefore, the Court DENIES

Defendants' motion for summary judgment as to Plaintiffs' tort claims for prospective

damages.

### 2. Whether Plaintiffs' Tort Claims Against Conoco are Time-Barred

California Code of Civil Procedure § 338(b) establishes a three-year limitation

period for claims based on "trespass upon or injury to real property."  Whether claims for

negligence, nuisance, or trespass, are time-barred under Cal. Code Civ. P. § 338(b)

depends on when the cause of action accrued.  *Mortkowitz v. Texaco*, 842 F. Supp. 1232,

1237 (N.D. Cal. 1994).  Resolution of a statute of limitations issue is normally a question

of fact.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (Cal. 2005).

In the case of injury to real property, the statute of limitations generally runs from

the date of the act causing "immediate" and "permanent" injury.  *Mortkowitz*, 842 F.

Supp. at 1237.  However, where a plaintiff could not have discovered the factual basis

for the claim despite reasonable diligence, the claim does not accrue until the plaintiff

has, or should have, inquiry notice of the facts giving rise to the action.  *Fox*, 35 Cal. 4th

at 807.  Unlike ignorance of the claim itself, "failure to discover, or have reason to

discover, the identity of the defendant does not postpone the accrual of a cause of

action." *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 399 (Cal. 1999).[10]

---

[10] As the California Supreme Court has explained, "the rationale for distinguishing between 'ignorance' of the defendant and 'ignorance' of the cause of action itself appears to be premised on the commonsense assumption that once the plaintiff is aware of the latter, he normally has sufficient opportunity, within the applicable limitations period, to discover the identity of the former.  He may often effectively extend[] the limitations period in question by the filing and amendment of a Doe complaint and invocation of the relation-back doctrine." *Norgart*, 21 Cal. 4th at 399 (internal citations omitted).

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Conoco argues that because Plaintiffs received reports in 2002 and 2005 indicating that Conoco had conducted an "enhanced leak detection test" revealing a "moderate-level release from the 10,000-gallon super unleaded tank [at the Station]" they should have known "by 2002 (and certainly no later than 2005) of the facts on which their claims...are based." *See* MSJ 3 at 7 (citing ECF No. 80 (Lathrop Decl.) ¶ 3-5). However, as Plaintiffs point out, their cause of action accrued not when they learned that the Station was contaminated, but when they learned that the Jimmy's Property was contaminated. *See, e.g.*, *Civic Western Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 16 (Cal. Ct. App. 1977) ("The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another."); *Yamagiwa v. City of Half Moon Bay*, 523 F. Supp. 2d 1036, 1101 (N.D. Cal. 2007) (nuisance requires substantial and unreasonable interference with the use of property).  Conoco does not offer evidence as to when contamination migrated onto the Jimmy's Property.  As Conoco bears the burden of establishing that Plaintiffs' claims are time-barred, their failure to produce evidence on this point is fatal to their motion.

Furthermore, under a permanent harm theory, Plaintiffs' claim may not have accrued until the contamination was discovered to be unabatable.  *See Bartleson v. United States*, 96 F.3d 1270, 1277 (9th Cir. 1996) (The statute of limitations did not begin to run "until the plaintiffs realized that they could not be given assurances regarding future shelling and that they would be required to report such shelling to future purchasers.").  As discussed above, when -- and whether -- the harm became unabatable is unclear.  The Court DENIES Conoco's motion for summary judgment as to Plaintiffs' tort claims.

**C.**      **Contract Claims**

18

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs allege that both BP and Conoco breached the Access Agreement by:
(1) failing to perform remediation activities directed by the SCVWD in accordance with
generally accepted practices and standards; (2) failing to protect the value of Plaintiffs'
property; (3) failing to provide notice before conducting monitoring activities; (4)
assigning rights and obligations under the contract to Conoco without Plaintiffs' written
consent; and (5) failing to remedy the contamination.  *See* ECF No. 34 (FAC) at ¶¶ 43-
47.   The Court considers Plaintiffs claims against BP and Conoco, as well as their
objections, separately.

### 1. Whether BP's Alleged Breaches of the Access Agreement are Causally Related to Plaintiffs' Damages

BP argues that Plaintiffs cannot seek diminution in value damages under a
contract theory because such damages are not causally connected to BP's alleged
breaches.  In order to recover damages for breach of contract, a plaintiff must show that
the breach was a "substantial factor" in causing the harm.  *US Ecology, Inc. v. State of
Cal.*, 129 Cal. App. 4th 887, 909 (Cal. Ct. App. 2005).  The term "substantial factor" has
no precise definition, but "it seems to be something which is more than a slight, trivial,
negligible, or theoretical factor in producing a particular result."  *Id.* (citing *Espinosa v.
Little Co. of Mary Hospital*, 31 Cal. App. 4th 1304, 1314 (Cal. Ct. App. 1995)).

In its Order of October 13, 2010**,** this Court held that the Access Agreement "is
unambiguous in imposing no requirement that Defendants undertake any particular
remediation … Plaintiffs cannot state a claim for breach of contract based on
Defendants' failure to remedy the contamination."  ECF No. 29 at 7 (Order Granting in
Part and Denying in Part Motions to Dismiss).  Accordingly, no contract damages can
stem directly from BP's alleged failure to remedy the pollution.  However, Plaintiffs may

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

still be able to seek damages for other alleged breaches if there is a genuine issue of

material fact as to whether those breaches were a substantial factor in diminishing the

value of the Jimmy's Property.

### a. Failure to "Protect the Value" of the Jimmy's Property

The Access Agreement states that "BP agrees to provide an indemnity to any

lender, lessee or purchaser" of the Jimmy's Property to insure against liability resulting

from contamination caused by BP.  ECF No. 34, Ex. B (Access Agreement) ¶ 18.  BP

argues that it complied with the "Value Protection Agreement" by providing an

indemnity agreement, or "comfort letter," to Plaintiffs, which they allegedly used to seek

financing.  However, the evidence cited by BP suggests it was Conoco, not BP, who

provided an indemnity letter.  *See*, *e.g.* ECF No. 66, Ex. A (Barrous Depo.) at 174.  The

plain language of the provision indicates that it is "BP" who is required to issue an

indemnity letter, not a third party.  Even if Conoco issued the letter at BP's request, it is

unclear whether that would constitute performance under the contract by BP.  Therefore,

there is an issue of fact as to whether BP was in breach.

Plaintiffs argue that uncertainty over whether BP or Conoco was responsible for

indemnifying potential lenders "negated the value of the defendants [sic] supposed

comfort letters."  Opp. to MSJ 1 at 23.[11]  According to Plaintiffs' expert, the fact that

only Conoco issued a comfort letter impacted Plaintiffs' ability to finance their property

because of the assumption that "each company is purporting to provide indemnity for

their own specific wrongdoing."  ECF No. 94 (La Barbera Decl.), Ex. A at 2.  As

potential lenders would be aware that there were multiple parties responsible for the

contamination of the Jimmy's Property, such uncertainty might have deterred creditors.

20

BP has offered no evidence to suggest that confusion over the responsible party did not diminish the value of Plaintiffs' property.  Whether BP's breach was a "substantial factor" in plaintiff's claims for damages is therefore a factual question.

### b. Failing to Provide Notice Before Conducting Monitoring Activities

Neither party provides evidence as to whether Defendants failed to provide notice before conducting monitoring activities, nor specifically addresses this argument in their briefs.  As such, there is no factual issue as to whether such a breach could give rise to Plaintiffs' claims for damages.

### c. Assigning the Agreement to Conoco Without Written Consent

"An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance."  Restatement (Second) of Contracts § 317(1).  The form of a transfer or assignment of contract rights is irrelevant, so long as "the intention of the transferor is ascertainable."  *Anglo Cal. Nat'l Bank v. Kidd*, 58 Cal. App. 2d 651, 655-56 (Cal. App. 1943); *see also SR Intl Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 394 F. Supp. 2d 585, 592-93 (S.D.N.Y. 2005) ("Regardless of the form whereby the December 2003 transaction was structured, the substance of the Purchase Agreement included a de facto assignment of the underlying rental insurance policies at issue here."); *Greco v. Or. Mut. Fire Ins. Co.*, 191 Cal. App. 2d 674, 683 (Cal. Ct. App. 1961) (assignment of accrued right to insurance proceeds may be expressed orally, in writing, or "may be the product of inference").  A provision restricting the assignment of a contract is generally enforceable.  *See, e.g.*, *Henkel Corp. v. Hartford Accident and Indemnity Co.*, 29 Cal. 4th 934, 943 (Cal. 2003).

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A reasonable jury could infer that BP intended to transfer its right to access the Jimmy's Property to Conoco.  Defendants concede that in 2005, Conoco assumed the "lead role" in conducting remediation activities from BP, and that no agreement explicitly granted Conoco access to the property.  They argue instead that "Secor [the entity retained by Defendants to conduct the remediation] accessed Plaintiffs' property as their *joint* contractor pursuant to BP's Access Agreement."  MSJ 3 Reply at 10.  However, even if BP intended only to *share* its contractual rights with Conoco, there is a question of fact as to whether such conduct would constitute a "de facto assignment" in violation of the non-assignment provision.  *SR Intl Bus. Ins. Co.*, 394 F. Supp. 2d at 593.  Accordingly, the Court GRANTS Defendants' motion as to Plaintiffs' claim that BP breached the notice and remediation provisions, but DENIES the motion as to the Value Protection Agreement and the non-assignment clause.

### 2.  Whether Plaintiffs Can State a Contract Claim Against Conoco

#### a.  Breach of the Access Agreement

Conoco argues that it cannot be held liable for breach of contract because any alleged assignment of the Access Agreement in contravention of the non-assignment provision is invalid.  *See, e.g.*, *Henkel Corp.*, 29 Cal. 4th at 943 ("Whether or not Amchem No. 1 assigned any benefits under the liability policies to Amchem No. 2, any such assignment would be invalid because it lacked the insurer's consent.").  If there is no valid contract between Plaintiffs and Conoco, the company contends, there can be no breach.

While Conoco's argument has a certain syllogistic appeal, the Court is not convinced.  The cases cited by Conoco hold only that a non-assignment clause is enforceable *by a party to the contract*.  *See id.*; *Johnson v. First Colony Life Ins. Co.*, 26

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F. Supp. 2d 1227, 1230 (C.D. Cal. 1998) ("Nonassignability clauses are routinely upheld as valid in California.").   It is clear that the Access Agreement's unilateral non-assignment provision was intended to benefit Plaintiffs, not to be used as a shield by a putative assignee.  *See, e.g.*, *Klamath Land & Cattle Co. v. Roemer*, 12 Cal. App. 3d 613, 619 (Cal. App. 5th Dist. 1970) ("A nonassignability clause is for the benefit of the vendor only.  It in no way affects the validity of an assignment without the vendor's consent as between his vendee, the assignor, and a third person assignee; the interest of the assignor in the contract passes to the assignee subject only to the rights of the original seller.").   Furthermore, it is clear that Conoco benefited from the Access Agreement by being able to enter Plaintiffs' property without consideration.  *See Walmsley v. Holcomb*, 61 Cal. App. 2d 578, 582 (Cal. Ct. App. 1943) (one who accepts the benefits of contractual rights may be "estopped from arguing that no assignment occurred"); *see also* Cal. Civ. Code § 1589 ("Voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.").[12]  In addition, the fact that Conoco issued a "comfort letter" to Plaintiffs suggests the company believed it had some obligation under the Access Agreement's value protection provision.  As discussed

---

[12] As Conoco notes, section 1589 "has generally been held to apply only where the person accepting the benefit was a party to the original transaction."  *Recorded Picture Co. [Productions] Ltd v. Nelson Entm't*, 53 Cal. App. 4th 350, 362 (Cal. Ct. App. 1997) (internal citations omitted).  Under a well established exception to the general rule, section 1589 "requires the [non-party] assignee of an executory contract to accept the burdens when *all* the benefits of a full performance have inured to him."  *Id*. (emphasis in original).  Clearly, all of the benefits of the Access Agreement have not inured to Conoco; by the time Conoco assumed responsibility for the cleanup, BP had been "benefitting" from the contract for five years.  However, while *Recorded Picture Co. [Productions] Ltd* would preclude a finding that Conoco assumed *all* of BP's obligations, it does not suggest that Conoco could not assume *any* responsibility under the contract.

23

above, there is a factual question as to whether BP intended to transfer its right to access

the Jimmy's Property to Conoco.  Therefore, a reasonable jury could conclude that

Conoco was bound to comply with at least *some* of BP's contractual obligations.

There is also a factual question as to whether Conoco breached those obligations

by transferring its "right" to enter Plaintiffs' property for the purpose of conducting

remediation activities to Delta without consent.  Douglas Umland, Delta's Rule 30(b)(6)

designee, testified that as of the summer of 2009, it was his "understanding that we were

okay to operate [on the Jimmy's Property] under an assignable condition with the

existing agreement."  ECF No. 97-1, Ex. D (Umland Depo.) at 43.  Mr. Umland also

testified that he learned of that "decision" from Shelby Lathrop, Conoco's site manager.

*Id*.  While Conoco attempts to "clarify" Mr. Umland's statements with a supplemental

declaration stating that Delta was acting as BP's agent, Plaintiffs' evidence is sufficient

to meet the summary judgment standard.  The Court DENIES Conoco's motion to

dismiss Plaintiffs' claim that Conoco breached its contractual obligations by attempting

to assign contractual rights to Delta.

### b.  Interference with Contractual Relations

Plaintiffs also claim that Conoco interfered with the Access Agreement by (1)

releasing BP of its remediation obligations in 2009; (2) attending mediation in lieu of

BP; and (3) assigning its rights under the Access Agreement to Delta.  *See* Opp. to MSJ 3

at 21-22.  As a result of Conoco's actions, Plaintiffs argue, Defendants "abdicated

responsibility for the cleanup."  *Id*. at 22.

A claim for intentional interference of contractual relations requires "(1) a valid

contract between plaintiff and a third party; (2) defendant's knowledge of this contract;

(3) defendant's intentional acts designed to induce a breach or disruption of the

24

contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990). Intent to interfere is essential; "if the actor does not have this purpose, his conduct does not subject him to liability *even if it has the unintended effect of deterring the third person from dealing with the other*." *Kasparian v. Cty. of Los Angeles*, 38 Cal. App. 4th 242, 270-71 (Cal. Ct. App. 1995) (emphasis in original).

Conoco does not dispute that it was aware of the Access Agreement. However, there is no evidence that Conoco *intended* to disrupt BP's valid contractual relationship with Plaintiffs. In addition, as noted above, BP owed Plaintiffs no obligation to remediate the Jimmy's Property; thus, any claim that Conoco's 2009 agreement with BP resulted in BP's abdication of its cleanup responsibilities must fail. Furthermore, the 2009 agreement releases BP from any claims *by Conoco* for environmental liabilities, but does not purport to absolve BP of its obligations to third parties. *See* ECF No. 99, Ex. I at 6. Conoco's attendance at the mediation session instead of BP does not establish interference with the Access Agreement; the correspondence between the parties suggests that Conoco participated because it was the lead party in the remediation, not because it intended to discourage BP from attending. *See* ECF No. 97 (Ellenberg Decl.), Ex. Q. Even if Conoco did seek to insert itself in the mediation in BP's place, Plaintiffs have not claimed any damages as a result. Therefore, the Court GRANTS Conoco's motion for summary judgment as to Plaintiffs' claim for intentional interference with contractual relations.

### D.   **Punitive Damages**

Under California law, punitive damages may be appropriate "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud,

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

or malice." Cal. Civ. Code § 3294.  While punitive damages are generally found to

apply only in cases of intentional harm, they may also be allowed in unintentional tort

claims.  *See Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1004 (Cal. 1993)

("Punitive damages sometimes may be assessed in unintentional tort actions under Civil

Code section 3294").  Malice may be shown where the defendant exhibits "the motive

and willingness to vex, harass, annoy, or injure," *Nolin v. Nat'l Convenience Stores, Inc.*,

95 Cal. App. 3d 279, 285 (Cal. Ct. App. 1979), or a "conscious disregard of the rights

and safety of others."  *Potter v. Firestone Tire & Rubber Co*., 6 Cal. 4th 965, 1000 (Cal.

1993).  A plaintiff may establish malice "by indirect evidence from which the jury may

draw inferences." *Taylor v. Superior Court*, 24 Cal. 3d 890, 894 (Cal. 1979).

     "In the usual case, the question of whether the defendant's conduct will support

an award of punitive damages is for the trier of fact, since the degree of punishment

depends on the peculiar circumstances of each case." *Johnson & Johnson v. Superior

Ct.*, 192 Cal. App. 4th 757, 762 (Cal. Ct. App. 2011) (internal citations omitted).  A court

may adjudicate the issue of punitive damages at the summary judgment stage, but should

not impose on a plaintiff the obligation to "prove" its case.  *Id*.  "Summary judgment on

the issue of punitive damages is proper only when no reasonable jury could find the

plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression."  *Id*.

     Where a plaintiff seeks punitive damages against a corporate employer, the

wrongful act giving rise to the harm must be committed by an "officer, director, or

managing agent" of the corporation.  *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 572 (Cal.

1999) (citing Cal. Civ. Code § 3294(b)).  The California Supreme Court has held that

managing agents are "those employees who exercise substantial independent authority

and judgment over decisions that ultimately determine corporate policy."  *Id*.

26

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

1     **1.  Punitive Damages Against BP**

2          **a.  BP's Delay in Implementing Remediation Activities**

3          The crux of Plaintiffs' argument for punitive damages is that despite notice of

4     contamination at the Station for at least eight years, BP did not take remedial actions that

5     might have prevented contamination at the Jimmy's Property until the company was

6     ordered to do so by a state court.  *See* Opp. to MSJ 4 at 2.  While Plaintiffs' citations to

7     the record leave much to be desired, they rely primarily on the expert report submitted by

8     Ron Helm.  Mr. Helm found that soil testing detected the presence of contaminants at the

9     Station as early as 1992.  *See* ECF No. 93 (Helm Decl.) Ex. A at 5.  While Mr. Helm did

10    not state specifically that BP conducted the testing, he noted that contamination analysis

11    performed in 1994 was "part of the baseline assessment for the transfer of facility

12    ownership from BP to Tosco."  *Id.*  Given that BP has conceded ownership of the Station

13    in 1992, the Court agrees with Plaintiffs that a reasonable jury could conclude that BP

14    had knowledge of contamination at the property in either 1992 or 1994.

15         It is undisputed that BP did not begin to conduct remediation activities at the

16    Station until September 2002, when it implemented the CAP pursuant to the consent

17    decree with the SCVWD and the Santa Clara DA's Office.  *See* MSJ 1 at 4 (Defendants'

18    Statement of Facts).  Mr. Helm found that "both BP and ConocoPhillips improperly

19    delayed implementing appropriate source control and remediation efforts to control the

20    contamination . . . .  This delay fell below generally accepted professional engineering

21    standards."  ECF No. 93 (Helm Decl.) ¶ 5.  Plaintiffs also cite the testimony of Louis

22    Mosconi, BP's Rule 30(b)(6) designee, who stated that of the thousands of remediation

23    projects in which he has been involved, he could not think of one in which a district

24    attorney's office has filed suit to compel cleanup.  *See* ECF No. 97, Ex. B (Mosconi

25    Depo.) at 95-96.

26         BP argues that Plaintiffs' allegations are insufficient to show malicious conduct.

27    Instead, BP points out that "delay can occur for any number of reasons, including

28

27

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

1   availability of contractors, government approval for permits, access agreements and other

2   various factors that go into implementing a comprehensive remediation project."  MSJ 4

3   at 13.  BP notes that the cleanup in this case was delayed in 1999 by Plaintiffs' refusal to

4   grant access to the Jimmy's Property, and in 2001 by the need to obtain a building permit

5   from the City of San Jose.  *See* MSJ 4 at nn.10-11.

6        Whether BP's delay in implementing a remediation program can constitute

7   "malice" under Section 3294 presents a close question.  Plaintiffs have offered no

8   evidence that BP intended to "vex, harass, annoy, or injure" them.  *Nolin*, 95 Cal. App.

9   3d at 285.  However, California courts have found punitive damages awards appropriate

10  for unintentional conduct "showing complete lack of concern regarding the harmful

11  potential-the probability and likelihood of injury," *id*,[13] or a "conscious disregard of the

12  rights and safety of others."  *Potter v. Firestone Tire & Rubber Co*., 6 Cal. 4th 965, 1000

13  (Cal. 1993).[14]  Here, a reasonable jury could find that BP's inaction for nearly ten years

14  exhibited clear and convincing evidence of a "complete lack of concern regarding the

15  harmful potential" of the contamination at the Station.  The Court therefore declines to

16  find that BP's conduct cannot constitute malice as a matter of law.

17

18  [13]   In *Nolin*, the Court of Appeal upheld a punitive award damage in a slip-and-fall case based
    on a finding that (1) Defendant's store manager was aware of a defective pump nozzle that spilled
19  gasoline, and of prior incidents of slip-and-fall, and reported these matters to defendant's district
    representative, but no attempt was made to repair the equipment; (2) The store also sold motor oil
20  by the can, without providing methods of opening cans or pouring the oil into the engine; and
    customers, borrowing ordinary can openers and fashioning makeshift funnels, frequently spilled
21  oil; and (3) Defendant had no adequate cleanup procedure and no warning signs advising patrons
    of the hazards.  *See* 95 Cal.App.3d 279.

22  [14]   The California Supreme Court in *Potter* upheld a finding of malice in a toxic harm case,
    noting that "the trial court determined that . . . officials in key management positions at Firestone's
23  Salinas plant had increased knowledge regarding the dangers involved with the careless disposal of
    hazardous wastes, and had a specific, written policy for hazardous waste disposal.  However, these
24  officials, while professing support for the policy in written distributions, in actuality largely
    ignored the policy. The court found especially reprehensible the fact that Firestone, through its
25  plant production manager, actively discouraged compliance with its internal policies and California
    law solely for the sake of reducing corporate costs.  Under these circumstances, we believe there
26  are sufficient facts supporting the trial court's conclusion that such conduct displayed a conscious
    disregard of the rights and safety of others."  6 Cal. 4th at 1000.

27

28

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

### b.  BP's Managing Agent

BP argues that even if its conduct was malicious, the corporation cannot be held liable because there is no evidence the decision to delay the cleanup was made by a "managing agent."  *See* Cal. Civ. Code § 3294(b).  Again, the question of whether a corporate employee exercises "substantial independent authority and judgment over decisions that ultimately determine corporate policy" is highly factual.  *See, e.g.*, *White*, 21 Cal. 4th 563 (a regional director of eight stores who supervised 65 employees and had "most if not all" of the responsibility for running the stores had sufficient authority over corporate policy to be a "managing agent"); *but see Cruz v. HomeBase,* 83 Cal. App. 4th 160, 168 (Cal. Ct. App. 2000) (a supervisor subordinate to the store manager in a single outlet of a multi-store chain who "supervised only a few employees, and had authority over only one narrow area of the single store's multifaceted operations: security" was not a managing agent as a matter of law).

Here, Plaintiffs assert that Scott Hootoon, a BP "portfolio manager," is a "main actor" who "direct[ed] the purported 'investigation' and 'remediation'" at the Station.  Opp. to MSJ 4 at 10.[15]  Plaintiffs claim that Mr. Hootoon's "failure to act promptly and diligently to clean-up [the Station] showed a conscious disregard on the behalf of BP towards the adjacent landowners."  *Id.*  Plaintiffs also distinguish the cases relied upon by Defendants by pointing out that unlike the commission of battery by a security supervisor, *Cruz*, 83 Cal. App. 4th 160, or sexual harassment of an employee by her boss, *Kelly-Zurian v. Wohl Shoe Co.*, 22 Cal. App. 4th 397 (Cal. Ct. App. 1994), BP's decision to delay remediation was not made by a "rogue employee."  Opp. to MSJ 4 at 9.  Rather, BP's conduct involved "multi-million dollar transactions between large oil

---

[15]  The only reference to Scott Hootoon that the Court has located in the record is a letter from Mr. Hootoon dated December 14, 2001.  *See* ECF No. 99, Ex. J.  It is addressed to the Environmental Compliance division at Tosco, Conoco's predecessor, and states that under the "Tosco/BP sale agreement," Tosco is responsible for "Corrective Action costs that may arise as a consequence of its ownership and operation of the site."  *Id.*

29

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1  companies," demanding the inference that the decisions alleged were "made with the

2  knowledge of the corporate entities and/or ratified."[16]  *Id.*

3      There is a genuine issue of material fact as to whether the decision to delay

4  remediation was made by a managing agent.  Plaintiffs have identified Mr. Hootoon, a

5  BP "portfolio manager," and alleged that he was entrusted with overseeing the allegedly

6  unlawful cleanup.  *See Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 823 (Cal. 1979)

7  (noting that the fact that the responsible party's business card identified him as

8  "Manager" was relevant to the determination of whether he was a managing agent).  The

9  evidence that Mr. Hootoon either made the decision to postpone remediation or had

10  discretion over "corporate policy" is thin.  However, when viewed in the light most

11  favorable to Plaintiffs, Mr. Hootoon's letter and his title as a "manager" could give rise

12  to the inference that he is a managing agent.  Furthermore, a trier of fact could infer that

13  the decision whether to institute a multi-million dollar cleanup operation is the kind of

14  determination that could only have been made by a managing agent.  In combination, a

15  jury could find that Plaintiffs have produced clear and convincing evidence of corporate

16  responsibility for the alleged conduct.  The Court therefore DENIES BP's motion for

17  summary judgment as to punitive damages.[17]

18      **2. Punitive Damages Against Conoco**

19      Plaintiffs claim that Conoco "operated the station in such a way as to allow

20  another dose of significant contamination…that ultimately migrated to Jimmy's

21  Property."  Opp. to MSJ 4 at 15.  In addition, Plaintiffs argue that punitive damages are

22  justified because Conoco "disrupted plaintiffs' contractual relationship with BP."  *Id.*  As

23  _____

[16]      *See Coll. Hosp. Inc. v. Superior Ct.*, 8 Cal. 4th 704, 726 (Cal. 1994) ("For purposes of
24  determining an employer's liability for punitive damages, ratification generally occurs where, under
the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive,
25  fraudulent, or malicious behavior by an employee in the performance of his job duties.").

26  [17]      Defendants also argue that punitive damages against BP North America and BP p.l.c. are
inappropriate because Plaintiffs have failed to establish an agency relationship between BP's parent
27  and subsidiary corporations.  The Court found above that such a relationship exists between BP
Products and BP North America, but not between BP Products and BP p.l.c.  As such, the Court
28  GRANTS BP's motion for summary judgment on punitive damages as to BP p.l.c.

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

**United States District Court**
For the Northern District of California

1    discussed above, Conoco is not liable for "disrupting" BP's obligations under the Access

2    Agreement because Plaintiffs have produced no evidence that Conoco intended to

3    interfere with the contract.  Furthermore, Plaintiffs cite no competent evidence that

4    Conoco's operation of the Station released additional contaminants, nor that any alleged

5    contamination was the result of Conoco's malicious conduct.  The Court therefore finds

6    that there is no issue of material fact as to whether Conoco's actions justify an award of

7    punitive damages, and GRANTS Conoco's motion for summary judgment.

8         **E.    Declaratory Relief**

9         To state a claim for declaratory relief, a plaintiff must "set[] forth facts showing

10   the existence of an actual controversy between the parties relating to their respective

11   legal rights and duties and request[] that these rights and duties be adjudged."  *Qualified*

12   *Patients Ass'n v. City of Anaheim*, 187 Cal. App. 4th 734, 756 (Cal. Ct. App. 2010).

13   Declaratory relief generally "operates prospectively, and not merely for the redress of

14   past wrongs," *Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal. App. 4th 1388, 1403 (Cal. Ct.

15   App. 2002), and should not be used to determine issues that are already "fully engaged

16   by other causes of action."  *Hood v. Superior Ct.*, 33 Cal. App. 4th 319, 324 (Cal. Ct.

17   App. 1995).

18        In its Order of October 13, 2010, the Court found that Plaintiffs had stated a claim for

19   declaratory relief based on the existence of their ongoing contractual relationship with Defendants

20   under the Access Agreement.  *See* ECF No. 29 (Order Granting in Part and Denying in Part

21   Motions to Dismiss).  At that time, the Court concluded it was "too early to determine whether the

22   resolution of [Plaintiffs' contract claims] will fully clarify the parties' rights and obligations under

23   the contract going forward, and not merely in relation to Defendants' past conduct."  *Id*. at 10.

24   Given that the Court has now determined that there are issues of material fact as to the contractual

25   relationship between Plaintiffs and both BP and Conoco, and that these motions for summary

26   judgment do little to clarify the parties' rights and obligations going forward, the Court DENIES

27

28

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

1  Defendants' motions for summary judgment on Plaintiffs' claims for declaratory relief.[18]

2

3                                    **IV. ORDER**

4          Good cause therefor appearing, the Court GRANTS in part and DENIES in part

5  Defendants' motions for summary judgment.

6

7

8  **IT IS SO ORDERED.**

9

10  Dated: October 3, 2011                          *Lucy H. Koh*

11                                                   LUCY H. KOH
                                                     United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

_____

26  [18] The parties have also submitted a number of motions requesting admission of and objecting to
     evidence nearly a month after the submission of Defendants' first motion for summary judgment.
27  *See* ECF No. 101; ECF No. 111; ECF No. 111.  Notwithstanding the fact that these motions are
     untimely, the Court has addressed any evidentiary objections relevant to its consideration of the
28  motions for summary judgment above.

                                                32

Case No.: 10-CV-02944-LHK
ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT